2023 IL App (1st) 200091-U

No. 1-20-0091

THIRD DIVISION
August 2, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 13756 |
| | ) | |
| ANTON CARTER, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE D. B. WALKER delivered the judgment of the court.
Presiding Justice McBride and Justice Van Tine concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction is affirmed where the photo array viewed by eyewitnesses was not unduly suggestive, the trial court did not err in admitting other-crimes evidence, limiting the testimony of defendant's expert witness or refusing defendant's modified jury instruction, defendant's trial counsel did not provide ineffective assistance, and the trial court properly denied defendant's motion to suppress his statement.

¶ 2    Defendant Anton Carter appeals his conviction after a jury trial for first-degree murder. On

appeal, defendant alleges that his conviction should be reversed and the cause remanded for a new

trial where: (1) witnesses improperly identified defendant as the offender based on an unduly suggestive photo array, (2) the trial court erred in limiting the testimony of defendant's expert witness and refusing defendant's modified jury instruction on eyewitness identification, (3) other-crimes evidence was admitted solely to show his propensity to steal vehicles, (4) defense counsel was ineffective for allowing witnesses to testify that defendant carried a firearm, and (5) detectives subverted their prior *Miranda* warnings when they assured defendant that his incriminating statement would be "off the record." For the following reasons, we affirm.

¶ 3                                   I. BACKGROUND

¶ 4      The State charged defendant with first-degree murder for the July 18, 2010 shooting death of Chicago police officer Michael Bailey, Sr. while attempting to commit an aggravated vehicular hijacking.

¶ 5                                  A. Pretrial Motions

¶ 6                      1. Defendant's Motion to Suppress Identification

¶ 7      Prior to trial, defendant filed a motion to suppress identification testimony based on an "unnecessarily suggestive" photo array. The array contained five photographs printed from an "inmate search" on the Illinois Department of Corrections (IDOC) website. At the hearing on the motion, defense counsel argued that the issue was "not the appearance of the individuals but what's under the appearance." The printouts contained the names of the individuals and all except defendant had the last name "Jones." Also, the inmates' height and weight were listed. Both eyewitnesses described the offender as "thin" or "skinny," and based on the information under the photos only three individuals could be described as such. The State denied that the array was unduly suggestive, arguing that defendant presented no evidence the identifying witnesses knew his name or read the information under the photographs.

¶ 8    The trial court expressed surprise that the photographs were taken "by someone in the penitentiary system" and "had information below them about what the person was there for, et cetera." It found, however, that even if all of the fillers had the last name of Jones, the array was not unduly suggestive because "[a] person might say it's one of the four people named Jones." Additionally, there was no evidence the witnesses knew the offender's last name or read the information under the photographs. Since the array was not "unduly suggestive so as to cause irreparable misidentification," the trial court denied the motion.

¶ 9    2. Defendant's Motion to Suppress his Statement and Motion *In Limine*

¶ 10    Defendant was interviewed by Detectives Stover and Murphy on July 6 and July 7, 2011. In his motion, defendant argued that the detectives subverted his *Miranda* rights by assuring him that his confession would be "off the record."

¶ 11    At the start of the interview on July 6th, detectives advised defendant that "[y]ou have a right to remain silent, you know that anything you say can be used against you in court, and you have a right to an attorney and if you can't afford one – one will be appointed by the court." Defendant was asked if he understood and he responded, "Yes."

¶ 12    Defendant also agreed to speak with detectives about the incident involving Officer Bailey. He denied that he shot Officer Bailey. When informed that police obtained letters defendant wrote and they interviewed "a lot of people," defendant asked, "did they tell on me though?" Detectives then asked defendant about the area where the shooting occurred:

"Q. Well how do you explain that people are putting you there?

A. Uh – people putting me there? I can't really say I don't think nobody putting me there I think that -

Q. You don't think we'd actually be b*********** you on that do you?

A. – this what I think though think that ya'll may know something because I got letters that I wrote.

Q. Not just letters.

Q. It's not letters it's people that seen you out there that's why I said you'd be standing in some lineups.

A. Oh people that's in – in the Party Town where (Inaudible) or people that's –

Q. Well –

A. – from –

Q. (Inaudible) 74th and Evans that's – you're gonna be in some lineups on.

A. – oh well."

\* \* \*

After detectives informed defendant that he would change his clothes for the lineup, the following exchange occurred:

"Q. You've been an absolute gentleman with us.

A. I'll - I'll be able to uh - get a phone call so I can't at least try to call –

Q. Once we're done with everything we have to do.

A. – (inaudible) the state's attorney decide to do what they wanna do –

Q. Yeah.

A. – I got an op – I got an - I'm – this off the record for you I'm gonna make a confessional to help you solve some more cases – another case.

Q. You are –

A. But I ain't gonna do that to [*sic*] soon though –

Q. – what kind of case though

A. – could be a murder.

Q. Really?

A. It depends.

Q. You – you're – you're gonna help us out with one huh?

A. Yea.

Q. He says he's gonna confess to a uh – and uh – a murder for us. I can't leave it in here, alright give me that bag."

Defendant was placed in a lineup for identification, and there is no indication in the record that detectives conducted further interviews that day.

¶ 13     On July 7th, detectives re-advised defendant of his *Miranda* rights. They asked if defendant understood he had a right to remain silent, that anything he says could be used against him in court, and that he had a right to an attorney. Defendant answered "yes" each time. The detectives continued their interrogation on the shooting of Officer Bailey. Defendant, however, refused to answer whether he knew he had shot a police officer. Questioning continued:

Q. I mean there's – there's – there's gotta be a hundred thousand people – coppers – policemen that wanna know what was Antwan [*sic*] Carter thinking that morning. Were you out to kill a policeman or was it just another stang [*sic*] that went bad?

A. No I'm not a killer; I'm a stick up man.

Q. You're a stick up man but like we talked yesterday when you put a pistol in somebody's face nine times out of ten that person don't come up with their own s*** and it's usually females or senior citizens or whatever right and they're easy targets correct you said that yesterday.

A. Yeah.

Q. They're easy until that one comes along where he comes up with his s*** and then it goes bad, 'cause at that point now you're fighting for your life to get the f*** outta there correct?

A. This is – this is gonna get written down if I say anything?

Q. I'm just asking you we just wanna know as men right here.

A. So this off the record?

Q. You wanna call it off the record we'll call it off the record.

A. Will I get a – a statement about it then?

Q. You can do a s –

A. What I'm talking about is you sign a paper saying that nothing I say to you right now will be used against me?

Q. Obviously I'm not gonna do that you gotta take our word we're – we're three men sitting here talking.

Q. I'm a man, you're a man –

A. But ya'll some detectives –

Q. – he's a man.

A. – ya'll all some detectives and ya'll had to do ya'll job.

Q. We are doing our job and – and – and we did – we are that's what we're doing and that's why I tell you right now we've got about – we've got a hundred thousand policemen at least that wanna know –

A. Why – why –

Q. – what was Antwan [*sic*] Carter thinking and what was your – are you going over there to gun him down because he's a policeman or are you going there to take his car?

A. – one more question real quick.

Q. Go ahead.

A. This happened on 74th and Evans right?

Q. (INDICATING).

A. Why – why the uh – 71st police station on 71st didn't pick it up?

Q. I'm not gonna go into you – with you why they didn't do A, B, or C. 'Cause –

Q. 'Cause we're the Detectives that's why.

Q. – the – the question-

Q. That's what you're asking.

[Redacted material]

Q. What did you do just a stick up?

A. (INDICATING) I'm a stick up man.

Q. Okay so tell us when you went to stick – so you go to stick him up what did he look like?

A. Like that paper I guess.

Q. What do you mean like the paper?

Q. Well was he look [*sic*] like a frail old man I mean –

A. Yea.

Q. – you prey on I mean let's not kid – you prey on women –

A. Prey on many white dudes who's –

Q. – (inaudible).

A. – who's easy targets.

Q. Right.

Q. Exactly and did – did – what did he look like to you when you walked up to him did he look like a policeman what did he look like, explain to us what he looked like to you? In your eyes you're walking up to him what are you thinking?

A. Just a regular person washing they [*sic*] car off guard.

Q. Exactly.

Q. But does that mean regular guy or old man? I mean he looked like an easy target right?

A. Yeah."

Shortly thereafter, defendant invoked his right to an attorney and questioning ceased.[1]

¶ 14    At the hearing on the motion to suppress, defense counsel argued that by requesting to keep his statement "off the record," defendant was invoking his right not to answer questions. He ultimately answered questions because he believed his statement would be "off the record."

¶ 15    The trial court disagreed that defendant generally invoked his right to remain silent. The court also disagreed that the detectives implied they would not use defendant's statement against him. Rather, they told defendant they would not sign a statement to that effect.

¶ 16    The trial court denied defendant's motion to suppress, finding "it was voluntarily" made. Also, "[t]here's no question [defendant] was advised of his rights." It found that defendant invoked his right not to answer questions when asked multiple times whether he knew Bailey was a police officer when the shooting occurred. However, when asked what the victim looked like:

"[defendant] doesn't invoke his right to remain silent at that point. He answered the question that he looked like a regular guy or whatever his answer might have been for that question. So sometimes when you say things, you don't realize what you're saying, but the

---

[1]We set forth other details of defendant's interrogation in the analysis as they pertain to his *Miranda* issue on appeal.

problem with that is if you're advised of your rights and you make a statement and you don't invoke your right to remain silent or right to have an attorney present, then whatever you might have said is not suppressible ***."

¶ 17    The trial court also ruled, pursuant to defendant's motion *in limine*, that it would not allow evidence that defendant usually "walks around with a gun." However, it would allow Snerling's testimony that defendant did not have his "thumper," or handgun, on him three days after the murder because that testimony referred to the "same incident" where Officer Bailey was shot.

¶ 18                    3. The State's Motion to Admit Other-Crimes Evidence

¶ 19    The State filed a motion to admit other-crimes evidence showing that defendant committed aggravated vehicular hijackings on July 22, 2010 and September 17, 2010, and had a 2004 conviction for possession of a stolen motor vehicle. The State argued that this evidence established motive where defendant indicated his intent to carjack Officer Bailey prior to the shooting. The State also argued that the evidence established *modus operandi* where all the crimes occurred on the south side of Chicago, defendant used a firearm, and he selected "easy target[s]." The victims were a 16 or 17 year old girl, a woman with a broken leg leaving the hospital, and an older man washing his vehicle. Defense counsel, however, argued that the evidence merely showed a propensity to commit vehicular hijacking rather than motive, and the crimes presented no distinguishing features that would indicate the same person committed them.

¶ 20    The trial court found that the other vehicular hijackings were "very similar incidents," close in time and space to the attempted hijacking of Officer Bailey's vehicle. Therefore, those crimes would tend to show "that the person who attempted to hijack the vehicle of the police officer on July 18th *** is the [person] who hijacked the vehicles on September 17th and July 22nd." It was identification evidence, as well as "a form of motive more or less." The trial court denied the

motion, however, regarding the 2004 possession of a stolen vehicle conviction because the crime occurred "a long time before," and no evidence connected that crime to the present offense. The court found insufficient similarity between the crimes to establish *modus operandi*.

¶ 21    Defendant filed a motion to reconsider, which the trial court granted in part. The court ruled that only evidence of the vehicular hijacking on July 22, 2010, four days after the shooting of Officer Bailey, would be admitted. The court reiterated that "enough similarity" existed between the July carjacking and the shooting to admit the evidence for purposes of identity and intent.

¶ 22                              B. Trial

¶ 23    Pamela Bailey testified that the victim was her husband. They lived in a house on the 7400 block of South Evans in Chicago. In May 2010, Officer Bailey bought a 2011 Buick Regal in anticipation of his upcoming retirement.

¶ 24    On July 18, 2010, around 6 a.m., Pamela was sleeping when noise and screaming awakened her. She ran outside and saw Officer Bailey lying on the street. He was on his back with his eyes open, but he never moved or acknowledged Pamela. Officer Bailey was transported to Northwestern Hospital where he died. After his death, Pamela gave Chicago police detectives his .357 magnum firearm.

¶ 25    Michael Bailey, Jr. testified that his nickname was Chip. In July 2010, he was living with his parents and his sister. On July 18, 2010, around 6 a.m., Chip returned home with a friend. He saw his father, wearing a black and tan unbuttoned jersey over his police uniform, washing his Buick Regal. While Chip was in the house, he heard his father yell "police" a couple of times. He then heard two gunshots, a pause, and five more gunshots. When he looked out of his bedroom window, he saw his father on the ground. Chip grabbed two firearms, ran outside, and found that his father had been shot in the neck and chest.

¶ 26    Chip observed a "tan pick-up truck" driving away. He grabbed his weapons and tried to shoot at the truck because he thought it "had something to do" with his father. Neither weapon fired, however, so he threw them to the ground. Chip removed a firearm from his father's hand and held him until the police arrived. Chip testified that in August 2012, he pled guilty to a charge of aggravated unlawful use of a weapon.

¶ 27    On cross-examination, Chip stated that he did not observe the shooting and when he looked out of his window, he did not see anyone but his father. He did not recognize the pick-up truck, which immediately drove away squealing its tires.

¶ 28    Glen Chamberlin testified that he lived across the street from the Baileys. His mother knew Officer Bailey and Chamberlin knew him as someone from the neighborhood. Chamberlin's bedroom window on the second floor faced the street.

¶ 29    On July 18, 2010, around 6 a.m., Chamberlin was sleeping when he awoke to the sound of 8 to 10 gunshots. From his bed, he immediately looked out the window. He observed a man aiming a firearm at Officer Bailey and running away. It was light outside and as the man fled, he ran past Chamberlin's window. Chamberlin could see the man's face. He did not see the man or Officer Bailey fire a weapon.

¶ 30    Chamberlin called 911 before going outside. He saw Chip with a firearm, running towards Officer Bailey. Chip ran into an alley and a couple of minutes later, he threw a firearm under a parked vehicle and returned to his father. When police arrived at the scene, Chamberlin told them what he observed. He described the offender as an African American male with low cut hair, possibly 19 years old, wearing a white t-shirt, blue jean shorts, and a brown belt. Chamberlin identified defendant in court as the man he observed running past his window holding a firearm.

¶ 31    On March 25, 2011, Chamberlin viewed a lineup at the police station where he identified "an older gentleman, light skinned." He was only "40 to 60 percent" sure of his identification because the person was much older than the man he observed. He agreed that it "was not a positive identification." On June 5, 2011, Chamberlin viewed a photo array from which he identified defendant as the person he observed with the firearm. He was sure of his identification. When he viewed the photo array, Chamberlin did not know defendant's name, and he did not read the printed words on the photos. He looked at "just the faces." Chamberlin viewed a lineup on July 6, 2011 and identified defendant as the man he observed pointing a firearm at Officer Bailey.

¶ 32    On cross-examination, Chamberlin testified that he did not hear anyone yell "police officer." He faced the window, so he just opened the curtain to observe the shooter. The shooter had a "silver chrome gun." Although there was a box fan in the south side of the window, Chamberlin looked through a couple of inches in the open north part of the window. He testified that there was a tree between his window and the area where Officer Bailey was lying on the ground. Chamberlin saw that names were printed on the photos in the array, along with "IDOC," but he did not read the names. He only looked at the faces.

¶ 33    On re-direct examination, Chamberlin testified that no one told him who to identify from the photo array and lineup, and he did not know defendant's name at the time. He clarified that the tree was not directly in front of his house but was located across the sidewalk and to the left. He observed defendant directly in front of his house where there was no tree. Chamberlin also had an unobstructed view of Officer Bailey on the ground.

¶ 34    Linda Smith testified that she lived on the 7400 block of South Cottage Grove in Chicago. Officer Bailey lived across the alley, and she knew he was a police officer. On July 18, 2010, around 6 a.m., she opened her bedroom window because it was hot outside. She observed Officer

Bailey's vehicle driving west on 74th Street. Shortly thereafter she heard a man say two times that he was a police officer. Linda heard gunshots, and someone said, "they killed my dad." Smith observed an African American male with short hair, between 20 to 30 years old, wearing dark shorts and a white shirt with blue on the sides, running across the street. She did not see his face. When she walked out her back door and through the alley, she saw Officer Bailey on the ground.

¶ 35    Sade Smith testified that she worked for the CTA. On July 18, 2010, she was scheduled to work the 6 a.m. shift but was running late. As she drove in the middle northbound lane of the Skyway, near 76th or 73rd and Stony Island, Sade observed a person "running across the Skyway from the southbound lanes" into her lane. She slowed her vehicle to about 20 miles per hour, but the person ran in front of her and she "clipped his leg and he fell." Sade testified that when she "clipped" him, the person was "very close" so that "[h]e could have got in the car with me." It was sunny outside, and nothing blocked her view of his face. Sade identified defendant in court as the person she observed running across the Skyway. He was wearing "blue shorts with a red/white type of top, some white and black shoes."

¶ 36    After clipping defendant, Sade "slowed down drastically." She looked in the mirror and saw him run towards a fence. Defendant's shorts "got snagged on the gate as he was trying to go over." After Sade lost sight of defendant, she exited the Skyway and called 911. She observed a "lot of police cars going towards" 75th and Cottage Grove.

¶ 37    Later that day, while at work, Sade spoke with detectives. She told them what happened and described the person she observed on the Skyway as an African American male, five-foot-six or five-foot-seven inches tall, with a slim build and low cut hair. He also had thick eyebrows.

¶ 38    On March 25, 2011, Sade viewed a lineup but did not identify anyone. On June 5, 2011, she viewed a photo array and identified defendant as the person she clipped. She did not hesitate

when she identified defendant. She did not know defendant's name when she viewed the array, and she only viewed the photograph portion of the photos. On July 7, 2011, Sade viewed a lineup and identified defendant as the person she clipped on the Skyway.

¶ 39     On cross-examination, Sade testified that she was driving less than 20 miles an hour when she clipped defendant. She described the contact as "more like a little bump." When she viewed the photo array, she looked at "just the pictures."

¶ 40     Police recovered four firearms, nine 9mm expended shell casings, a bullet jacket, bullet fragments and a belt loop from the scene. The firearms and belt loop were swabbed for DNA analysis. Medical Examiner James Filkins performed an autopsy on Officer Bailey. He found four gunshot wounds and determined there was no evidence of close range firing on any of the wounds. The manner of death was homicide.

¶ 41     Before the State's next witness testified, the trial court instructed the jury on other-crimes evidence. The court told the jury it would hear evidence that defendant was involved in another offense, and the evidence "will be received on the issues of the defendant's identification and intent and may be considered by you only for that limited purpose." Furthermore, it was for the jury "to determine whether the defendant was involved in that offense, and if so, what weight should be given to this evidence on the issues of identification and intent."

¶ 42     Sharon Bins testified that in July 2010, she wore a cast on her foot. On July 22, 2010, Bins drove her 2007 white Hyundai Azera to Jackson Park Hospital to visit her husband's grandmother. Bins left the hospital around 1:30 p.m. As she walked to her car, she observed a man walking towards her. As Bins approached her car, the man pointed a silver revolver in her direction. She was facing him, and his firearm touched her stomach. She could see his face. Bins identified defendant in court as that man. Defendant demanded her keys and money and "snatched" her phone

from her hand. Bins gave him the keys to her vehicle but told him she had no money. Defendant took her vehicle and drove away.

¶ 43 Two days later, Bins was at home with her husband Tommy when they received a call from Tommy's friend, Shane Kizer. After the call, Bins called the police and she and Tommy drove to the area of Stony Island and 95th Street. There, she observed her Hyundai at a red light. Kizer was also at the light. Kizer and Tommy tried to "box [the vehicle] in," but the vehicle crossed "all the lanes of traffic" and turned onto 95th Street. They tried to follow the Hyundai, but it was being driven "quickly" and the vehicle being driven never stopped at stoplights or stop signs. Since Tommy drove more cautiously, they lost sight of the vehicle. After speaking again with Kizer, they drove to 93rd and University where they saw that the Hyundai had crashed through a gate. No one was in the vehicle.

¶ 44 Antoin "Tony" Brown testified that his parents lived on the 1200 block of East 69th Street in Chicago. He was familiar with the people on the block. In April or May of 2010, defendant stayed with his friend Landon Snerling, who also lived on the block. Brown testified that defendant, Jermaine Wilkins, Nunu, Hershey, Tia and Ebony used the vacant lot next to his parents' house as a hangout. Brown identified defendant in court. Before Brown testified further, the trial court again instructed the jury on other-crimes evidence.

¶ 45 Brown testified that on July 25, 2010, he heard defendant "bragging" in a loud voice to Wilkins and the others in the vacant lot. Defendant told them he had carjacked a vehicle and the owner chased him. Defendant then crashed the vehicle and "hurt his side." A few days later, Brown again observed defendant in the vacant lot with Snerling, Nunu, Ebony, Wilkins, Hershey and Devonna. Defendant said that he tried to carjack someone and get money from that person, but "the man flinched like he had a weapon" so defendant shot him. Defendant said he shot an officer.

¶ 46    Defendant was "bragging," saying he "didn't give a f***" and would do it again. Brown had watched the news and thought defendant was talking about Officer Bailey. He saw that defendant had a firearm in his left front pocket. The others told defendant to stop bragging about shooting a police officer, and Nunu said he should turn defendant in for the reward money. Two days after that second conversation, Brown again heard defendant talking in the vacant lot. Defendant said he did not know the man was a police officer when he tried to carjack him, but the man told defendant he was a police officer.

¶ 47    After this third conversation, Brown called 911. When police arrived, Brown directed them to Snerling's house, but they did not find defendant. After the police left, Brown observed defendant leave Nunu's house. After viewing a photo array in 2011, Brown identified defendant as the person who bragged about killing Officer Bailey.

¶ 48    On cross-examination, Brown acknowledged that he did not call the police when he heard defendant brag about a carjacking, or the first time defendant bragged about shooting a police officer. Brown only spoke with defendant when he told him to stop bragging. Also, Brown never heard defendant say he was hit by a car.

¶ 49    Edward "Jermaine" Wilkins testified that he met defendant through Snerling. At the time of trial, Wilkins was in custody for pending drug and firearm charges.

¶ 50    In July 2010, Wilkins was in front of Snerling's house with Snerling, Nunu, Hershey, CJ, Tim, and Myesha when defendant told them he tried to rob someone at 74th and Evans. Defendant wrestled with the person and had to shoot him. Defendant told them to watch the news. He was "amped up" when talking, and Wilkins told defendant "he was stupid as hell."

¶ 51    The following day, the same group was at Snerling's house. Wilkins told defendant he watched the news, and defendant said he shot a police officer. Wilkins again told defendant he was

"dumb as hell." Wilkins testified that he was familiar with defendant and knew he carried a .38 caliber blue steel revolver. When Wilkins met with detectives on July 13, 2011, he informed them of defendant's statements.

¶ 52    On cross-examination, Wilkins acknowledged that he did not call the police. He also stated that defendant did not provide details of the shooting other than he wrestled with the officer before shooting him. Wilkins testified that defendant carried a firearm. When asked the color of the weapon, he answered, "[i]t was blue steel, he had a silver one."

¶ 53    Elizabeth Haley, a firearms examiner at the Illinois State Police Crime Lab (Crime Lab), examined the bullets, shell casings and firearms recovered in the case. She received a 9 mm Smith & Wesson semi-automatic pistol, a Beretta .380 semi-automatic pistol, a replica firearm, and a Davis .380 semi-automatic pistol. Only the Smith & Wesson and Beretta firearms were operable.

¶ 54    Haley determined that all nine of the 9 mm expended shell casings were fired from the Smith & Wesson. Also, three of the fired bullets came from a firearm in the .38 or .357 caliber class but were not fired from any of the firearms she received. However, they were likely fired from the same revolver. Haley received a Smith & Wesson .357 revolver in March 2011 and a Smith & Wesson .32 revolver in June 2011, but neither of these weapons matched the firearms evidence recovered from the crime scene.

¶ 55    On cross-examination, Haley testified that a "blue steel" firearm would look "almost like a black or a dark blue color."

¶ 56    Scott Rochowicz, a forensic scientist at the Crime Lab, examined the kit administered on Officer Bailey's hands. They tested positive for the presence of gunshot residue.

¶ 57    The parties stipulated that Detective John Dougherty would testify that he interviewed defendant on August 4, 2010. Defendant told him his nickname was "Twan" and he lived on the

1200 block of E. 69th Street with Snerling. He denied knowledge of Officer Bailey's murder. Defendant consented to a buccal swab.

¶ 58 The parties also stipulated that Chip could not be excluded as a possible donor of the DNA mixture found on the replica handgun, but defendant was excluded as a contributor. They further stipulated that the DNA profiles found on the Smith & Wesson handgun were not suitable for comparison. Officer Bailey was identified as the possible donor of the major male DNA profile found on a belt loop recovered at the scene. Defendant was excluded as a major contributor. Minor parts of the DNA mixture identified from the belt loop were not suitable for comparison.

¶ 59 Floyd Payne testified that he had a conviction for narcotics and for unlawful use of a weapon. In December 2010, he was transported to the Bridgeview courthouse for a court date. While in a holding cell with defendant and other inmates, Payne overheard defendant say that he killed a police officer "early in the day" with a .38 revolver. Payne identified defendant in court. Defendant also said that he thought a friend "snitched" on him. Payne did not know defendant prior to that day and did not know the people defendant spoke to in the cell. On cross-examination, Payne stated that defendant did not say when or where the shooting occurred or that he was hit by a vehicle.

¶ 60 Adam Rivera testified that he pled guilty to vehicular hijacking, kidnaping, and armed robbery in April 2011. In December 2010, he was transported to the Bridgeview courthouse where he spoke with defendant while they were in a holding cell. He identified defendant, whom he called "Twon," in court. Defendant said that he killed a police officer at 74th and Evans. Rivera told him to "quit telling people your story" because "he was incriminating himself." Defendant, however, "just kept telling people." On cross-examination, Rivera testified that he did not know defendant before speaking to him in the holding cell. Defendant talked "[l]ike a gangster."

¶ 61    Snerling testified that he was currently at Cook County jail for failing to appear in court in defendant's case. He also had a 2009 firearm conviction and a robbery case pending in Iowa.

¶ 62    Snerling testified that in May 2010, defendant lived in his house on the 1200 block of E. 69th Street in Chicago. In July 2010, Snerling learned that a police officer had been killed. He knew that defendant carried a .38 caliber revolver, and that "thumper" meant a firearm. He acknowledged that he spoke with police on June 12, 2011, and gave a handwritten statement to Assistant State's Attorney (ASA) John Murphy that same day. He also acknowledged that he testified before the grand jury on June 13, 2011.

¶ 63    However, Snerling denied making statements to the grand jury or ASA Murphy that incriminated defendant. He did not recall stating that defendant told him "he had a cowboy story," meaning "a shootout with guns." He also did not remember stating that defendant "did not have his thumper on him." Snerling admitted that he signed a handwritten statement prepared by ASA Murphy, and defendant sent him letters from jail. Snerling also acknowledged that defendant called him from jail on November 2, 2016 and told him not to show up for defendant's trial. Snerling was subsequently arrested in Utah.

¶ 64    On cross-examination, Snerling testified that defendant had a black revolver and was known to exaggerate.

¶ 65    ASA Murphy testified that he took Snerling's handwritten statement on June 12, 2011. The statement was published to the jury. The statement provided that a few days after Snerling learned of the police officer shooting, defendant said: "Damn, boy, I got this cowboy tale to tell you ***. You see, I ain't got the thumper on me" because all of the bullets had been fired. Defendant shot first and the man "upped a gun back." Defendant waited until the man "ran out of bullets" before

defendant "ran off." The shooting occurred at 74th and Evans. Snerling did not believe defendant and thought he "might have been bragging."

¶ 66    Snerling and defendant had a second conversation about the shooting in the presence of Nunu, Hershey, and Wilkins. Defendant bragged about exchanging gunshots with a police officer. Wilkins called defendant "dumb" for shooting an officer, and defendant replied that he did not "give a f*** if he is a police officer or not, I got away." Nunu joked that he would turn in defendant for the reward. On cross-examination, ASA Murphy acknowledged that Snerling did not say defendant ran across the Skyway or was hit by a vehicle.

¶ 67    ASA John Dillon testified that he presented Snerling to the grand jury on July 13, 2011. In summary, Snerling stated that in July 2010, defendant spoke about Officer Bailey's shooting while they were on Snerling's porch. Defendant said he had a "cowboy story" to tell and he did not have his "thumper" with him, which Snerling understood meant a firearm. Defendant used the firearm when he approached a man who shot at defendant. Defendant was able to return fire. He dove over a vehicle and raised his hand to keep shooting because the man was also shooting. When the man ran out of bullets, defendant ran away. The shooting occurred at 74th and Evans. Defendant thought he had hit the man. Snerling knew that defendant carried a .38 revolver.

¶ 68    Snerling had a second conversation with defendant about the shooting in the presence of Nunu, Wilkins and Hershey. Defendant was "bragging" and Wilkins said he was "stupid as hell" for shooting an officer. Defendant replied that "I don't give a f*** that's a cop or not as long as I got away." Nunu joked about turning in defendant for the reward. Snerling also stated that defendant mailed letters to him from jail, and he gave them to the police when they executed a search warrant at his home. Snerling gave a handwritten statement to ASA Murphy and signed every page acknowledging that his statements were true.

¶ 69    Isaiah Johnson testified that he has convictions for escape, drugs, and possession of a stolen motor vehicle. From January to April 2011, he shared a jail cell with defendant. Johnson did not recall speaking with detectives on July 7, 2011. He also did not recall speaking with ASA Lisette Mojica or giving her a handwritten statement. Although Johnson recalled testifying before the grand jury, he denied that defendant talked about the shooting.

¶ 70    Before Johnson testified further, the trial court instructed the jury on other-crimes evidence. Johnson then testified that he did not recall telling ASA Mojica or the grand jury that defendant said he carjacked a woman in the summer of 2010, or that the woman's son chased him, and he crashed the vehicle.

¶ 71    On cross-examination, Johnson testified he was taking medications for bipolar disorder and ADHD in July 2011. He identified Defense Exhibit 6 as an affidavit in which he stated that a detective promised him reward money. He also identified Defense Exhibit 7 as a letter he wrote to the state's attorney's office complaining that he never received a reward. On re-direct, Johnson did not recall testifying at a hearing in January 2019 that he did not send the letter.

¶ 72    Detective Paul Alfini testified that he and Detective Patrick Hackett spoke with Johnson on July 7, 2011. They did not offer Johnson money although there was a reward for information about the shooting. They executed a search warrant at Snerling's house on June 12, 2011 and recovered a .32 caliber revolver. On cross-examination, Detective Alfini acknowledged that defendant did not say he ran on the Skyway or that he was hit by a vehicle.

¶ 73    ASA Mojica testified that she took Johnson's statement on July 7, 2011. In summary, the statement provided that he and defendant were cellmates. Defendant told Johnson that "he was fighting a carjacking case, a gun case, and a murder of a police officer." Tia and Hershey's brother turned defendant in on the police murder case. Defendant said that he tried to take the man's

vehicle but was unaware the man was a police officer. He shot the man and then ran to Snerling's house. While in custody, defendant told someone to move the firearm. Defendant also carjacked a vehicle using a firearm, a man chased him, and defendant crashed the vehicle. On cross-examination, ASA Mojica did not recall if Johnson said defendant ran across the Skyway or was struck by a vehicle on the Skyway.

¶ 74 ASA Dillon testified that he presented Johnson to the grand jury in July 2011. In summary, Johnson testified that he was defendant's cellmate. Defendant told Johnson he was fighting "a police murder, a pistol case, and a carjacking." Tia and Hershey's brother turned defendant in for the reward money. In the summer of 2010, defendant tried to steal a man's new car. Defendant shot the man and ran to Snerling's house. Defendant did not know the man was a police officer when he shot him. He had a friend move the firearm he used. Defendant also told Johnson about carjacking a woman on Stony Island in the summer of 2010. Her son chased him, and defendant crashed the vehicle and "bailed." Johnson further testified that he spoke with detectives and ASA Mojica on July 7, 2011, and his handwritten statement to ASA Mojica was true.

¶ 75 On cross-examination, ASA Dillon stated that neither Snerling nor Johnson said that defendant ran across the Skyway or was hit by a vehicle.

¶ 76 Brian DeBlasio testified that he was serving a sentence for residential burglary. In July 2011, while awaiting trial, DeBlasio worked as a barber at Cook County Jail. While DeBlasio cut defendant's hair, defendant said he was "the one that murked that m*********** Officer Bailey." DeBlasio explained that "murked" meant defendant killed someone. Defendant said he was looking for a vehicle to carjack and "came upon an older guy that was washing his car." However, "something went wrong" and defendant had "to take care of *** business." Defendant participated in a lineup, but he was not concerned because no one saw him shoot the man and

defendant "got rid" of the firearm. Defendant boasted about the shooting. DeBlasio wrote a letter to the state's attorney's office and met with detectives. He identified defendant from a photo array. On cross-examination, DeBlasio testified that defendant was housed on the abnormal behavior deck and wanted respect when he talked about killing Officer Bailey.

¶ 77    Detective Timothy Murphy testified that he and Detective Stover were assigned to investigate Officer Bailey's murder. Police combed the Skyway between 73rd and 75th Streets for evidence but they recovered nothing. Railroad tracks cross the Skyway in that area and run about four houses from Snerling's house.

¶ 78    In March 2011, Horace Harrington, a known heroin addict in the area, was placed in a lineup. Glen Chamberlin stated that Harrington "looked 85% like the person he saw running," but he thought the offender looked "much more younger" and "more agile" than Harrington. Sade Smith viewed the same lineup but did not identify anyone.

¶ 79    Detective Murphy compiled a photo array in June 2011 from photos of inmates at the IDOC. Sade identified defendant as the person she saw running across the Skyway. Chamberlin identified defendant as the man he saw running from the crime scene with a firearm.

¶ 80    Detective Murphy also recovered letters written by defendant when he executed a search warrant at Snerling's house. In the letters, defendant attempted to find out who "told" on him, and he acknowledged that too many people knew what he had done. Defendant wrote that "I got my case beat. My lawyer said that they don't have the evidence they need to convict me. They don't have a [*sic*] eyewitness or the murder weapon." In another letter, defendant told Snerling that he was wrong when he "said it wasn't [defendant] that did that to the police."

¶ 81    Detective Murphy transported defendant from Cook County Jail to Area 2 on July 6, 2011. He placed defendant in an interview room and advised him of his *Miranda* rights. He also gave

defendant food and a drink. When detectives asked about Bins' carjacking, defendant admitted that he observed Bins near Jackson Park Hospital and took her white Hyundai at gunpoint. He stated that he crashed the vehicle when her family chased him. Detective Murphy told defendant he had been identified by DNA and defendant said he was a "stick-up guy." Bins identified defendant in a lineup on July 6, 2011 as the man who took her vehicle at gunpoint.

¶ 82    Detective Murphy spoke with defendant again on July 7, 2011. The interview was videotaped and clips from the interview were published to the jury. After further investigation, Detective Murphy arrested defendant on July 26, 2011 for the murder of Officer Bailey. While being transported for processing, defendant said that Adam Rivera betrayed him.

¶ 83    On cross-examination, Detective Murphy stated that when he created the photo array, he obtained photos from an IDOC computer because he could not access the police department database from his laptop. The photos had the words "IDOC" and "inmate search" on the top of the page, and the inmates' names were under the photos. All of the filler photos had the last name of Jones, and none of the men used as fillers were in the lineup with defendant.

¶ 84    After the State rested, defendant filed a motion for a directed verdict which the trial court denied. The trial court also ruled on defendant's proposed jury instruction. The proposed instruction was a modification of Illinois Pattern Jury Instruction No. 3.15 (IPI No. 3.15) on eyewitness testimony. The trial court refused the modified instruction.

¶ 85    The State then moved to limit the testimony of defense expert witness Geoffrey Loftus. First, the State sought to preclude Dr. Loftus from testifying that a subsequent identification is less reliable where a witness viewed a lineup after seeing defendant's picture in a photo array. The State also sought to prevent Dr. Loftus from testifying about double-blind lineups where the person

conducting the lineup does not know the offender's identity. The State argued that the law did not require double-blind lineups when the lineup in this case was conducted.

¶ 86    The trial court granted the State's motion on both issues. The court found that a lineup in which defendant participated, where defendant was first identified in a photo array, was not suggestive. The court reasoned, "I can't say they can do it otherwise. *** A guy is picked out of a photo array, he is arrested a month or two or eight or nine years later; no lineup then? That's improper according to Loftus?" Defense counsel responded that "all Dr. Loftus will be here to testify about is the reliability of identifications ***, that the lineup, the second identification, is less reliable because of the photo array." The trial court ruled, however, that Dr. Loftus could not testify about whether defendant's lineup was reliable.

¶ 87    The court also found that Dr. Loftus' testimony about double-blind identification procedures would be "purely hypothetical ***." Dr. Loftus would testify that without a double-blind lineup, an officer may consciously or unconsciously direct the witness to identify a suspect by "scratching his nose or ear. It doesn't happen in this case whatsoever anyway." It would be improper for Dr. Loftus to testify "[h]ypothetically if that would have happened how would that affect the lineup or whatever." The court concluded that "whether lineups are reliable or not, that is up to the jury to decide."

¶ 88    Dr. Karl Reich testified for the defense. He performed an independent review of the DNA analysis conducted by the Crime Lab. Dr. Reich agreed that Officer Bailey was the major contributor of the DNA profile found on the belt loop and that defendant was excluded from the major profile. Also, DNA from two people other than Officer Bailey was on the belt loop. Defendant was not one of those people. On cross-examination, Dr. Reich acknowledged that he did not know the gender of the contributor to the minor DNA profile found on the belt loop.

¶ 89    Dr. Loftus testified that for at least 50 years, he has researched "how you get information into your brain from the world through your sense organs," as well as the "associated study of human memory which is *** how information once it's in the brain is stored there, transforms, is supplemented and eventually used for anything you do that requires memory ***." He reviewed the identification procedures used in the case.

¶ 90    Dr. Loftus testified that memories of an event are comprised of two elements. First, memory consists of conscious experiences of the event. Information gained from conscious experience is "sparse" because a witness "can only remember what [they] were paying attention to ***." This route is time-limited because once the event ends, so does the conscious experience. Also, "all information decays away over time." If a witness viewed an event in less than optimal circumstances, "forgetting" may occur so that "information will have decayed away to zero maybe after eight or ten months." The less time a person has to view an offender, the more difficult it is to memorize the offender's appearance. Although not as much information is obtained by conscious experience, it is accurate and true.

¶ 91    Another way a witness forms memories of an event is by unconsciously integrating post-event information into the original memory. Such information is "dubious" because one "does not know whether the post event information is accurate or whether it is inaccurate." Even if the information is false, it may seem quite real to the person remembering the event. Post-event information may include identification procedures that involve a "physical bias."

¶ 92    A photo array where the fillers are the same in some way, but the defendant is different, contains a physical bias. Dr. Loftus testified that the photo array used in this case contained a physical bias because all of the photos, except defendant's, had the name Jones. A witness viewing the array could unconsciously supplement their memory with that post-event information. The fact

that two witnesses identified defendant after viewing the photo array does not itself imply that their memories were reliable or accurate. Dr. Loftus testified that:

"if you go back and discover that the circumstances for forming a memory were poor, attention wasn't paid, there wasn't enough time and/or a long time had elapsed between the event and when the identification procedure takes place[,] under those circumstances high confidence doesn't necessarily equate to high accuracy."

¶ 93 Dr. Loftus acknowledged, on cross-examination, that he could not determine whether Chamberlin or Sade made a wrong identification.

¶ 94 Following closing arguments, the jury found defendant guilty of the murder of Officer Bailey, who defendant should have known was a police officer, and he personally discharged a firearm that caused Officer Bailey's death. Defendant filed a motion for a new trial which the trial court denied. After a hearing, the trial court sentenced defendant to a mandatory natural life sentence and, in its discretion, imposed a second natural life sentence for the use of a firearm. Defendant filed this appeal.

¶ 95                                  II. ANALYSIS

¶ 96                     A. Motion to Suppress Identification

¶ 97 Defendant contends that the trial court erred when it denied his motion to suppress identification evidence obtained pursuant to an unduly suggestive photo array. Defendant bears the burden of proving that the identification procedures used were unnecessarily suggestive and, as a result, there was a substantial likelihood of irreparable misidentification. *People v. Lawson*, 2015 IL App (1st) 120751, ¶ 39. When reviewing the trial court's ruling on a motion to suppress, we accord great deference to the court's factual findings and will reverse only if those findings are against the manifest weight of the evidence. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001). A

finding is manifestly erroneous if it is unreasonable, arbitrary, or not based on the evidence. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). However, we review *de novo* the trial court's ultimate determination to grant or deny the motion. *Id.*

¶ 98    Defendant argues that Chamberlin and Sade viewed an unduly suggestive photo array where each person's name was under the photograph, and all of the fillers had the last name of Jones. Also, defendant was the only person in the lineup who was also in the photo array. Defendant contends that the array impermissibly "spotlighted" him for identification in the lineup.

¶ 99    Although defendant's photograph had a different last name than the other photographs in the array, "[d]ifferent need not be equated with suggestive." *People v. Bryant*, 94 Ill. 2d 514, 520 (1983). In *Bryant*, the supreme court found that the photo array used to identify the defendant was not impermissibly suggestive, even though defendant's photograph was the only Polaroid photograph. *Id.* at 519-20. It reasoned that "a different format does not automatically render a photo suggestive: it may make it more so or less so." *Id.* at 520. Here, the trial court similarly found that rather than highlight defendant, who had a different last name, the fact that the other photographs bore the last name "Jones" might cause a person to "say it's one of the four people named Jones."

¶ 100   In addition, the trial court found no evidence that the witnesses knew the offender's last name or read the information under the photographs. Both witnesses testified that they did not read the names but instead looked only at the "pictures" or "faces." The trial court's determination that the array was not unduly suggestive was reasonably based on the evidence.

¶ 101   Furthermore, a lineup is not unduly suggestive merely because defendant was the only participant that witnesses previously viewed in a photo array. *People v. Johnson*, 149 Ill. 2d 118, 148 (1992). Rather, defendant must show some evidence of improper influence indicating he was

spotlighted by the authorities. *Id.* at 147. Such evidence may include requiring defendant to wear distinctive clothing allegedly worn by the offender, pointing him out to the witnesses before or during the lineup, or asking all the participants to try on clothing that fits only defendant. *Id.* Defendant does not argue that his appearance in the lineup was unduly suggestive, nor has he pointed to evidence of improper influence other than the photo array.

¶ 102   Even if defendant had shown that the array or lineup was impermissibly suggestive, identifications made under suggestive circumstances are admissible if reliable. *Bryant*, 94 Ill. 2d at 520. This check is required to avoid unnecessarily depriving the jury of reliable identification evidence, notwithstanding improper conduct. *In re T.B.*, 2020 IL App (1st) 191041, ¶ 35. Factors to consider when evaluating the reliability of identifications are (1) the opportunity to view the offender at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the offender; (4) the witness' level of certainty when identifying defendant; and (5) the length of time between the crime and the identification. *People v. Littleton*, 2014 IL App (1st) 121950, ¶¶ 82-85 (citing *People v. Slim*, 127 Ill.2d 302, 307–08 (1989)).

¶ 103   Chamberlin testified that he lived across the street from Officer Bailey and his bedroom window on the second floor faced the street. Around 6 a.m. on July 18, 2010, Chamberlin was awakened by gunfire and immediately looked out his window. It was light outside, and he observed a man aiming a firearm at Officer Bailey and running past his window. Chamberlin could see the man's face as he fled. He described the offender as an African American male with low cut hair, 19 years old, wearing a white t-shirt, blue jean shorts, and a brown belt. When Chamberlin viewed the photo array on June 5, 2011, he identified defendant as the person he observed with a firearm, and he was sure of his identification. He also identified defendant in a lineup on July 7, 2011.

¶ 104   Sade testified that around 6 a.m. on July 18, 2010, she was driving northbound on the Skyway when she observed a person run across the southbound lanes into her lane. Although she slowed her vehicle, she "clipped" the man causing him to fall. The man was "very close" so that he could have "got in the car." It was a sunny day, and nothing blocked her view of his face. After clipping the man, Sade looked back and saw him run towards a fence. She described him as an African American male, five-foot-six or five-foot-seven inches tall with low cut hair and thick eyebrows. He was wearing "blue shorts with a red/white type of top" and white and black shoes. Sade identified defendant as that man in a photo array on June 5, 2011, without hesitation. She identified defendant in a lineup approximately one month later.

¶ 105   Both eyewitnesses had a good opportunity to view defendant in daylight and, especially in Sade's case, in close proximity. They focused their attention on the event they witnessed, and they gave a similar description of the offender. Defendant does not challenge their descriptions of him. Chamberlin and Sade expressed certainty when identifying defendant in the photo array and lineup, and they also identified him in court. While their identifications occurred 11 months after the crime, courts have found identifications made after longer periods reliable. See *People v. Malone*, 2012 IL App (1st) 110517, ¶ 36 (identification made one year and four months after the crime); and *People v. Rodgers*, 53 Ill.2d 207, 214 (1972) (identification made two years later). Considering the totality of the circumstances, we find Chamberlin's and Sade's identifications reliable and based on their recollections, regardless of the photo array. Therefore, even if an error occurred in conducting the photo array, it was harmless error. See *People v. Hartzol*, 222 Ill. App. 3d 631, 644–45 (1991) (finding the totality of the circumstances showed that the witnesses' identifications were reliable, so any error in the pretrial identification procedure was harmless).

¶ 106   Defendant disagrees, arguing that "both identifications were of a stranger for only a brief moment during a high stress situation." Furthermore, Chamberlin viewed the scene through an opening of "a couple inches," while Sade was driving at a high rate of speed when she first observed someone running across the Skyway.

¶ 107   Defense counsel thoroughly cross-examined both witnesses at trial, so the jury knew the circumstances under which Chamberlin and Sade viewed the events. The trustworthiness of eyewitness testimony is "within the common knowledge and experience of an average juror," and the jury may believe as much or as little of a witness' testimony as it sees fit. *People v. Romero*, 384 Ill. App. 3d 125, 132 (2008). The jury found Chamberlin and Sade to be credible witnesses who provided reliable identification testimony. It is for the jury, as factfinder, to determine the credibility of the witnesses, weigh their testimony and resolve inconsistencies or conflicts in the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). We will not substitute our judgment for that of the jury. *People v. Brown*, 2013 IL 114196, ¶ 48.

¶ 108   Additionally, even if the trial court had suppressed the photo array identifications, both Chamberlin and Sade observed the offender and positively identified defendant in court as that person. Brown and Wilkins also testified that defendant bragged about trying to carjack someone, but the man flinched as if he had a weapon and defendant shot him. Defendant said that he shot a police officer, that he "didn't give a f***" and would do it again. This testimony was corroborated by defendant's cellmates, Payne and Rivera, who also testified that defendant said he killed a police officer. The only witnesses who did not similarly testify were Snerling, defendant's friend, and Johnson, one of defendant's cellmates. Their testimony at trial, however, was contradicted by prior statements to assistant state's attorneys and the grand jury. Those prior statements mirrored the testimony of Brown, Wilkins, and the other witnesses.

¶ 109 Significantly, defendant himself made statements corroborating this testimony. In letters to Snerling, which defendant acknowledged he wrote, he stated that "I got my case beat" because "they don't have the evidence they need to convict me," and he told Snerling he was wrong when he "said it wasn't [defendant] that did that to the police." Defendant also wrote in a letter that someone "told" on him and that too many people knew what he had done. When defendant spoke with Detectives Murphy and Stover, he acknowledged that the police may "know something" because of the letters he wrote to Snerling. Defendant viewed Officer Bailey as an easy target for carjacking because he was an older man washing his vehicle who was not paying attention.

¶ 110 Given the evidence against defendant, the outcome of his trial would not have been different if the trial court had granted his motion to suppress the photo array identifications.

¶ 111                                    B. Expert Testimony

¶ 112 Defendant alternatively contends that if the trial court properly admitted the identifications, it erred in barring Dr. Loftus from testifying about the preference for double-blind procedures where the officer conducting the array or lineup does not know the suspect's identity. The officer conducting the lineup viewed by Chamberlin and Sade knew defendant was a suspect.

¶ 113 Expert testimony "is only necessary when the subject is both particularly within the witness's experience and qualifications and beyond that of the average juror's, and when it will aid the jury in reaching its conclusion." *People v. Lerma*, 2016 IL 118496, ¶ 23. Before admitting such testimony, the trial court should carefully consider its relevance given the specific facts of the case. *Id.* We review the trial court's decision to admit expert witness testimony for an abuse of discretion. *Id.*

¶ 114 Defendant relies on *Lerma* for support. In *Lerma*, the defendant filed a pretrial motion to allow testimony from an expert on the topics of memory and eyewitness identification. *Id.* ¶ 8. The

expert would testify regarding " 'common misperceptions' " about the accuracy and reliability of eyewitness identifications. *Id.* After the trial court denied the motion, the defendant filed two motions to reconsider. The second motion requested that Dr. Loftus be allowed to testify as an expert in the field of human perception and memory. *Id.* ¶ 14. Particularly relevant to the case, he would testify regarding the reliability of a witness who identified a suspect with whom they were acquainted. *Id.* Dr. Loftus would explain that when the circumstances in which a person perceived an offender are poor, whether due to low lighting, a great distance between them, a short time duration, or the presence of a weapon, " 'the witness will tend to perceive the person as the expected acquaintance even if the person is in fact someone else.' " *Id.* The trial court denied the motion to reconsider.

¶ 115   On appeal, the appellate court reversed and, after granting leave to appeal, the supreme court affirmed the appellate court. The supreme court found that expert testimony was relevant and appropriate for this type of case. The victim was shot and killed while sitting on his front porch at night with a friend, Lydia Clark. *Id.* ¶ 5. Clark testified that a man wearing a dark hooded sweatshirt pulled a gun and began shooting at her and the victim. *Id.* ¶ 6. The victim covered her with his body, and they fell to the ground. *Id.* When the shooting stopped, Clark saw that the victim had been shot and pulled him into the house. She heard the victim name the defendant as the shooter. The victim later died. The next morning, Clark went to the police station where she identified the defendant as the shooter. She also identified him in open court. *Id.* Clark testified that she knew the defendant only by his nickname and that she had seen him about 10 times in the past year. However, on cross-examination she stated that she had seen the defendant only once or twice and had never had a conversation with him. *Id.*

¶ 116   The court noted that there was no physical evidence tying the defendant to the crime, and Clark and the victim were the only eyewitnesses. Therefore, the case against defendant depended "100% on the reliability of its eyewitness identifications." *Id.* ¶ 26. Also, several factors Dr. Loftus identified as contributing to the unreliability of eyewitness testimony were present: the stress of the event, the presence and use of a weapon, exposure to post-event information, nighttime viewing, and cross-racial identification. *Id.* In addition, Clark provided conflicting testimony on how well she actually knew the defendant. *Id.*

¶ 117   The supreme court found that Dr. Loftus would have provided relevant and probative testimony "that speaks directly to the State's only evidence against" the defendant. *Id*. ¶ 32. Therefore, the trial court abused its discretion in denying the defendant's request to allow Dr. Loftus to testify as an expert witness. *Id.*

¶ 118   *Lerma* is distinguishable. Where the trial court in *Lerma* barred Dr. Loftus from testifying altogether, the trial court here allowed Dr. Loftus to testify. The record shows that he testified extensively on how memories of an event are formed and how the accuracy of memories is affected by factors including whether the witness viewed the event in less than optimal circumstances, whether the witness paid attention to relevant information, and the amount of time the witness had to view the offender. Dr. Loftus also testified about "dubious" memories based on post-event information such as a biased identification procedure. He opined that witnesses viewing a biased array could unconsciously supplement their memory with that post-event information. Dr. Loftus testified using his expertise as it pertained to the facts of the case. This was exactly the type of expert testimony the trial court in *Lerma* should have allowed.

¶ 119   Although defendant argues that the court should have also allowed Dr. Loftus to testify about the reliability of double identifications and double-blind procedures, we disagree. The trial

- 34 -

court need not "allow an expert to render an opinion on every conceivable question simply because such expert is qualified to do so." *People v. Cloutier*, 156 Ill. 2d 483, 502 (1993). Furthermore, the photo array and lineup identifications comprised only part of Chamberlin's and Sade's identification of defendant. They also observed him on the day of the shooting and identified him in court. The trial court determined that the overall reliability of their identifications, including those based on the array and lineup, was for the jury to decide. We find that the court did not abuse its discretion in limiting the scope of Dr. Loftus' testimony. See *People v. Corral*, 2019 IL App (1st) 171501, ¶¶ 113-14 (the trial court correctly left the issue for the jury when it barred an expert from testifying on the reliability of eyewitness identification).

¶ 120                                    C. Jury Instruction

¶ 121   Defendant also contends that the trial court erred in refusing to give defendant's proposed jury instruction. Instead, the trial court gave the jury IPI No. 3.15, which provides:

> "When you weigh the identification testimony of a witness, you should consider all the
> facts and circumstances in evidence, including, but not limited to, the following:
> The opportunity the witness had to view the offender at the time of the offense.
> The witness's degree of attention at the time of the offense.
> The witness's earlier description of the offender.
> The level of certainty shown by the witness when confronting the defendant.
> The length of time between the offense and the identification confrontation."

This pattern instruction should be given when "identification is an issue." IPI Criminal 4th, No. 3.15, Committee Notes.

¶ 122   Defendant argues that his instruction, which modified IPI No. 3.15, more accurately reflected current law and the evidence presented at trial. His instruction omitted the fourth listed

factor, level of certainty, and added three new factors: (1) "The stress of the event itself;" (2) "The use and presence of a weapon;" and (3) "Exposure to post-event information."

¶ 123 "The function of jury instructions is to convey to the jury the law that applies to the evidence presented." *People v. Herron*, 215 Ill. 2d 167, 187 (2005). Although courts have acknowledged issues concerning a witness' certainty level (see *e.g. People v. Allen*, 376 Ill. App. 3d 511, 524-26 (2007)), consideration of all five factors remains the law in Illinois. *People v. Piatkowski*, 225 Ill. 2d 551, 567 (2007). Additionally, both Chamberlin and Sade expressed certainty in their identifications of defendant, and Dr. Loftus testified that witness confidence is not always a reliable indicator of accuracy. As such, witness certainty was an evidentiary issue for the jury to determine. Factors listed in IPI No. 3.15 that are supported by the evidence should be included in the instruction. *People v. Gonzalez*, 326 Ill. App. 3d 629, 639 (2001).

¶ 124 Moreover, the fundamental purpose of instructions is to provide the jury with accurate legal principles so it can reach a correct conclusion based on the evidence. *People v. Pierce*, 226 Ill. 2d 470, 475 (2007). Assuming, *arguendo*, that defendant's additional factors were essential to a proper jury determination in his case, jurors most likely considered them when weighing the identification testimony under IPI No. 3.15. When evaluating a witness' degree of attention at the time of the offense, an ordinary person would consider how the presence of a weapon or stress of an event might affect a witness' attention to details. Also, an ordinary person would consider a witness' exposure to post-event information when assessing the length of time between the offense and the identification. See *Herron*, 215 Ill. 2d at 187-88 ( the propriety of jury instructions depends upon whether ordinary persons acting as jurors would understand them). Even without defendant's added factors, IPI No. 3.15 did not mislead the jury or prevent it from applying the law to the

evidence in the case. Therefore, the trial court did not abuse its discretion in giving the jury IPI No. 3.15 instead of defendant's modified instruction.

¶ 125                               D. Other-Crimes Evidence

¶ 126   Next, defendant contends the trial court erred in admitting evidence that he committed another crime, where such evidence proved only his propensity to steal vehicles.

¶ 127   Evidence is admissible if it is relevant. *People v. Pikes*, 2013 IL 115171, ¶ 21 (citing Ill. R. Evid. 402 (eff. Jan. 1, 2011)). Relevant evidence tends to make the existence of any fact consequential to the case's determination more or less probable than it would be without the evidence. *Id.* (citing Ill. R. Evid. 401 (eff. Jan. 1, 2011)). Other-crimes evidence, however, is generally inadmissible not because it is irrelevant, but because it has "too much" probative value. *People v. Manning*, 182 Ill. 2d 193, 213 (1998). Such evidence may cause the jury to convict a defendant for being "a bad person deserving punishment." *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). Other-crimes evidence is admissible, however, "to prove intent, *modus operandi*, identity, motive, absence of mistake, and any material fact other than propensity that is relevant to the case." *Id.* We review the trial court's ruling on the admissibility of other-crimes evidence for an abuse of discretion. *Id.* at 182.

¶ 128   Here, the trial court admitted evidence of defendant's carjacking of Bins to establish identification and intent. Defendant contends that other-crimes evidence is admissible to establish identity only if, like the *modus operandi* exception, there is a high degree of similarity between the prior and present offenses. The trial court, however, found the similarities not "sufficient enough" to establish *modus operandi*. Therefore, defendant argues, the court erred in admitting the evidence to show identity.

¶ 129 We agree that there must be a high degree of similarity between the facts of the crime charged and the other offense if the evidence is used to show *modus operandi*. See *People v. Illgen*, 145 Ill. 2d 353, 372-73 (1991). The requirement that both offenses share distinctive common features serves to "earmark both acts as the handiwork of the same person." *Id.* at 373. The trial court, however, also admitted evidence of Bins' carjacking to establish defendant's intent when encountering Officer Bailey. "[W]hen the evidence is offered to prove criminal intent or the lack of an innocent frame of mind, general similarities will suffice to justify admission." *People v. Johnson*, 239 Ill. App. 3d 1064, 1074 (1992).

¶ 130 The State charged defendant with murder for the shooting death of Officer Bailey, which occurred during an attempted vehicular hijacking. The trial court noted that Bins' carjacking occurred "about a mile and a half away" from Officer Bailey's attempted carjacking. The carjackings were "four days apart" and defendant approached each victim with a firearm. Both victims were easy targets: Bins had a cast on her leg and Officer Bailey was of retirement age. While defendant did not fire his weapon during the Bins carjacking, the "existence of some differences between the prior offense and the current charge does not defeat admissibility because no two independent crimes are identical." *Donoho*, 204 Ill. 2d at 185. Since general similarities existed between the two crimes, the trial court properly admitted the other-crimes evidence to establish defendant's criminal intent.

¶ 131 Defendant argues that the prior carjacking was insufficient to show intent "because it was not part of a pattern of crime occurring that day," citing *People v. Brown*, 194 Ill. App. 3d 958 (1989). Although the court in *Brown* found that the defendant's participation in a nearby burglary occurring around the same time was admissible to show his intent, the fact that the two offenses occurred on the same night was not the only consideration. See *Id.* at 968. Other courts have found

the intent exception to apply when the other crimes occurred years before the present offense. See *People v. Carr*, 188 Ill. App. 3d 458, 463 (1989) (admitted evidence of the defendant's prior arrests from more than a year ago); *Illgen*, 145 Ill. 2d at 362 (admitted evidence of prior beatings that occurred 17 years ago). *Brown* is not dispositive here.

¶ 132   We also disagree that evidence of Bins' carjacking devolved into a "mini-trial." Other-crimes evidence that is relevant "must not become a focal point of the trial." *People v. Boyd*, 366 Ill. App. 3d 84, 94 (2006). Here, the State presented 23 witnesses, including Bins. Witness testimony comprised more than 1,000 pages of the record. Bins' testimony, which comprised about 38 pages of the record, was the only testimony that addressed the other offense in detail. The other three witnesses testified only that defendant had said he had carjacked someone and crashed the vehicle after being chased by the owner's family member. The State's 275 exhibits included only 8 photographs of Bins' crashed vehicle.

¶ 133   Defendant's cases, *People v. Nunley*, 271 Ill. App. 3d 427 (1995), *People v. Bedoya*, 325 Ill. App. 3d 926 (2001), and *People v. Brown*, 319 Ill. App. 3d 89 (2001), are distinguishable. In those cases, this court found that the other-crimes evidence became the improper focus of the trial where witnesses testified extensively about the gruesome details of the prior crime (*Nunley*), or the bulk of the State's case consisted of detailed and repetitive testimony about the other offense (*Bedoya* and *Brown*). In this case, the prior offense contained no details that could inordinately inflame the jury, and the amount of evidence presented on defendant's current case dwarfed the other-crimes evidence.

¶ 134   Furthermore, before each witness testified about the carjacking, the trial court instructed the jury to consider the other-crimes evidence only for identification and intent. Where the bulk of the State's case did not consist of other-crimes testimony, and the trial court admonished the jury

to consider the evidence for limited purposes, "any prejudice from it would not outweigh its probative value." *People v. Novak*, 242 Ill. App. 3d 836, 860 (1993).

¶ 135                           E. Ineffective Assistance of Counsel

¶ 136 Defendant contends that defense counsel provided ineffective assistance by allowing witnesses to testify that defendant "usually carries guns." To prevail on his ineffective assistance of counsel claim, defendant must show that trial counsel's performance fell below an objective standard of reasonableness, and he was prejudiced by counsel's substandard performance. *People v. Enis*, 194 Ill. 2d 361, 376 (2000). Defendant's failure to satisfy either the deficiency prong or the prejudice prong precludes a finding of ineffective assistance of counsel. *Id.* at 377.

¶ 137 Matters of trial strategy are generally immune from ineffective assistance of counsel claims. *People v. West*, 187 Ill. 2d 418, 432 (1999). Furthermore, a defendant is entitled to reasonable, not perfect, representation. *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). The "fact that another attorney might have pursued a different strategy, or that the strategy chosen by counsel has ultimately proved unsuccessful, does not establish" deficient performance. *Id.* We view claims of ineffective assistance "not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review." *Id.* at 330-31.

¶ 138 Prior to trial, defense counsel filed a motion *in limine* to prohibit the State from eliciting testimony that defendant carried a firearm. The trial court granted the motion in part and denied it in part. The court barred testimony that defendant "usually carries guns." It denied the motion, however, regarding Snerling's statement that defendant did not have his "thumper," or firearm, on him three days after Officer Bailey's murder.

¶ 139 At trial, the assistant state's attorney asked Snerling whether he told the grand jury that defendant said he had a cowboy story, meaning a "shootout with guns," and that defendant "did

not have his thumper on him." Snerling answered, "I don't remember." The assistant state's attorney then asked Snerling:

"Q. What did you understand the defendant Twan to mean when he said thumper?

A. Thumper? I – I knew a term that they came out in the streets.

Q. What is that term?

A. The term that I think is a gun.

* * *

Q. And did you know Twan or Antwon [*sic*] Carter to carry a gun with him?

A. Yes.

Q. What type of gun?

A. A 38.

Q. What type of 38 caliber gun?

A. A 38. A 38 revolver I think. Revolver.

THE COURT: Speak up.

Q. And had you seen the defendant with this type of gun before your conversation on July of 2010?

A. Yes.

Q. Now, after the defendant told you that he did not have the thumper on him, what did he say happened regarding to the shooting?"

¶ 140    Defendant argues that the State elicited this testimony contrary to the court's ruling on the motion *in limine*, and defense counsel should have objected to it at trial. The trial court, however, allowed Snerling's testimony regarding defendant's "thumper" because it referred to the incident in which Officer Bailey was shot. The State, accordingly, asked Snerling about the type of firearm

he understood defendant to have when defendant said he no longer had his "thumper on him." The trial court's ruling on the motion *in limine* did not preclude such testimony. Therefore, counsel was not deficient in failing to object to this testimony at trial.

¶ 141   Defendant also contends trial counsel improperly elicited Wilkins' testimony, on cross-examination, that defendant carried a .38 revolver. When asked the color of the firearm, Wilkins answered, "It was blue steel, he had a silver one." Defendant argues that this testimony connected defendant to the firearm used against Officer Bailey where Chamberlin testified that he saw the offender with a "silver chrome gun."

¶ 142   Defense counsel, however, elicited testimony from firearms examiner Haley that a blue steel weapon looked dark blue or black in color. Together, the testimony of Wilkins and Haley gave the jury reason to question whether defendant shot Officer Bailey where defendant was known to carry a dark blue or black firearm. Any confusion over whether defendant had a blue steel or silver chrome firearm, or both, was for the jury to resolve. See *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 21 (as the trier of fact, the jury resolves conflicts or inconsistencies in the evidence). Counsel's strategy was objectively reasonable, if ultimately unsuccessful.

¶ 143   Furthermore, defendant was not prejudiced by counsel's performance. In assessing prejudice, we consider whether there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *People v. Johnson*, 2021 IL 126291, ¶ 54. A reasonable probability is one "sufficient to undermine confidence in the outcome." *Id.*

¶ 144   The outcome of defendant's trial would not have changed absent Wilkins' testimony. Defendant himself acknowledged that he carried a firearm when he referred to himself as a "stick up guy." His statements, and testimony from other witnesses, also connected him to the shooting of Officer Bailey. Additionally, the positive and credible identification of defendant by a single

witness is sufficient to sustain a conviction. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). Here, two eyewitnesses positively identified defendant in a photo array, a lineup and in court. Defendant's failure to establish prejudice defeats his ineffective assistance claim.

¶ 145                F. Defendant's Statements to Detectives (*Miranda* violation)

¶ 146   Defendant admitted to detectives that Officer Bailey looked like a "frail old man" who was "washing [his] car off guard." He was an "easy target." Defendant contends that these incriminating statements should have been suppressed where detectives assured him that he could speak "off the record." We review the trial court's decision on a motion to suppress under a two-part standard. *People v. Salamon*, 2022 IL 125722, ¶ 75. We will reverse the trial court's factual findings only if they are against the manifest weight of the evidence, but we review *de novo* the ultimate legal question of whether suppression of defendant's statements was warranted. *Id.*

¶ 147   Detectives Stover and Murphy interviewed defendant on July 6 and July 7, 2011. Each day, before questioning commenced, they apprised defendant of his *Miranda* rights. Defendant indicated that he understood his rights, and he chose to speak with detectives thereby waiving his rights. Here, defendant acknowledges that he waived his *Miranda* rights when the interviews began. He argues, however, that the detectives' subsequent assurance that he could speak "off the record" subverted his prior knowing waiver.[2] Therefore, the trial court should have suppressed any statements he made thereafter as a *Miranda* violation.

¶ 148   To be valid, defendant's waiver of his *Miranda* rights must be voluntary, knowing, and intelligently made. *Salamon*, 2022 IL 125722, ¶¶ 76-77. An intelligent and knowing waiver requires that defendant be fully aware of the right he is abandoning, and the consequences of his

---

[2]This exchange is fully set forth in paragraph 13.

decision to abandon it. *People v. Bernasco*, 138 Ill. 2d 349, 360 (1990). In other words, defendant must be "cognizant at all times of 'the State's intention to use [his] statements to secure a conviction' and of the fact that one can 'stand mute and request a lawyer.' " *Id.* quoting *Moran v. Burbine*, 475 U.S. 412, 422 (1986). When "determining whether a defendant knowingly and intelligently waived his *Miranda* rights, a court must consider the totality of the circumstances, including the characteristics of the defendant and the details of the interrogation, without any one circumstance or factor controlling." *People v. Reid*, 136 Ill. 2d 27, 54-55 (1990).

¶ 149   We reviewed the audio and video recordings, and it is clear that defendant understood his right to remain silent and that anything he said could be used against him. As the trial court noted, detectives asked him multiple times whether he knew Officer Bailey was a police officer when he shot him. Each time, defendant responded that he "won't answer" or "can't answer" the question because if he did, he would "admit to doing it." He understood that his answer was "something [the detectives] could use against" him. Significantly, defendant never answered that question, even after detectives allegedly assured him that he could speak "off the record."

¶ 150   Additionally, despite any assurances they may have given, detectives did not misrepresent their intent in questioning defendant. When he asked them to "sign a paper saying that nothing I say to you right now will be used against me," they responded, "[o]bviously [we're] not gonna do that you gotta take our word we're – we're three men sitting here talking." Defendant then replied, ""But ya'll some detectives *** and ya'll [have] to do ya'll job." Defendant did not believe he could speak freely. Rather, he understood that detectives wanted a statement from him in order to obtain a conviction.

¶ 151   Defendant also understood that he could "stand mute and request an attorney." (Internal quotation marks omitted.) *Bernasco*, 138 Ill. 2d at 360. After the "off the record" exchange,

detectives asked him once again whether he knew Officer Bailey was a police officer when he shot him. When defendant invoked his fifth amendment right to remain silent and asked for an attorney, detectives immediately terminated the interview. Defendant, who was in court "once a month" for the past seven months, showed familiarity with his *Miranda* rights, and he exercised them.

¶ 152   Defendant's awareness that his statements could be used against him in court, and that he could remain silent and request an attorney, exemplified the mental state necessary for a valid *Miranda* waiver. *Bernasco*, 138 Ill. 2d at 360. Considering the totality of the circumstances, we find that defendant knowingly and intelligently waived his rights when he made his statements. See also *People v. Wilson*, 138 Ill. App. 3d 513, 522 (1985) (defendant's alleged "off the record" statements were admissible where he was warned, and he understood, that anything he said could be used against him). Accordingly, the trial court did not err in denying his motion to suppress.

¶ 153   Defendant cites *State v. Pillar*, 359 N.J. Super. 249 (2003) and *People v. Braeseke*, 25 Cal. 3d 691 (1979) to show that by saying defendant's statement would be "off the record," the detectives undermined their *Miranda* warnings. However, we do not find these cases persuasive. This court is not bound by the decisions of other states. *People v. Sullivan*, 366 Ill. App. 3d 770, 781 (2006). We also note that *Braeseke* was vacated by the United States Supreme Court in *California v. Braeseke*, 446 U.S. 932 (1980).

¶ 154   In any event, these cases are distinguishable. In *Pillar*, the officers agreed to hear the defendant's statement "off-the-record." *Pillar*, 359 N.J. Super. at 262. In *Braeseke*, the court found that the defendant lacked understanding of the *Miranda* warnings. *Braeseke*, 25 Cal. 3d at 702-03. Here, unlike the officers in *Pillar*, the detectives refused to agree that defendant's statements would not be used against him. In contrast to the defendant in *Braeseke*, defendant here displayed

comprehension of *Miranda* warnings when he invoked his right to remain silent and requested an attorney.

¶ 155                                III. CONCLUSION

¶ 156   For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 157   Affirmed.